941 F.2d 1210
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cecil Gary NOBLE, Plaintiff-Appellant,
v.
NATIONAL MINES CORPORATION (No. 90-6191), Defendant-Appellee.
Cecil Gary NOBLE, Plaintiff-Appellee,
v.
NATIONAL MINES CORPORATION, (No. 91-5070), Defendant-Appellant.
 Nos. 90-6191, 91-5070.
 United States Court of Appeals, Sixth Circuit.
 Aug. 14, 1991.
 
 Before MERRITT, Chief Judge, BOGGS, Circuit Judge, and HULL, District Judge.*
 MERRITT, Chief Judge.
 
 
 1
 This appeal arises from a protracted dispute over two tracts of land in Breathitt County, Kentucky. It is the third time that the parties are before this Court. The litigation began in 1976 when plaintiff sued defendant to quiet title to the land, to enjoin defendant from interfering with his use of the land, and to recover damages as a result of defendant's use of the land. Plaintiff seeks to overturn the decision of the District Court in which the court ruled for defendant on all counts after full trial. As to this issue, we affirm the District Court's decision. In another appeal consolidated with this matter, defendant seeks to overturn the District Court's order forcing it to pay plaintiff's share of the special master's fee. Regarding the special master's fee, we reserve opinion temporarily on this matter while chief settlement attorney for the Court, Mr. Robert Rack, attempts first to resolve this issue by encouraging negotiation between the parties.
 
 BACKGROUND
 
 2
 The full facts of this case were discussed in Noble v. National Mines Corp., 774 F.2d 144 (6th Cir.1985). It is important to note that the two disputed tracts of land are in rural eastern Kentucky and that neither party resides on the land or is in actual possession of it, although defendant continues to extract coal from the property. Also, each party claims the property under chains of title originating from different patent grants from the Commonwealth of Kentucky in the 1800s.
 
 
 3
 In the first appeal in this case, this Court in an unpublished opinion reversed the District Court's finding that plaintiff had failed to establish valid title to the property. The reason for reversal was that the District Court had refused to reopen the evidence so that plaintiff could introduce further proof to support his claim of title.
 
 
 4
 On remand, both parties provided additional support for their respective claims to title. The District Court found for defendant, concluding that: (1) there was a missing link in plaintiff's chain of title because of an unauthorized partnership deed to plaintiff and, alternatively, (2) even without considering the unauthorized partnership deed, plaintiff's claim to title was inferior to defendant's. Plaintiff appealed and this Court again reversed. First, we found that the partnership deed to Noble was not void on its face. Second, we ruled that plaintiff should be allowed to present additional evidence regarding the location of the disputed tracts of land, this proof being relevant because plaintiff alleged defendant's patents did not completely embrace the land plaintiff claimed through his patents.
 
 
 5
 On remand, the District Court assigned this matter to a special master, a specialist in Kentucky land disputes. This person considered additional evidence from both parties and found a defect in plaintiff's claim to title. The District Court separately considered the issue and also ruled for defendant on the same grounds as the special master. In this final appeal, the essence of plaintiff's argument is that the District Court erred in finding that the patents through which plaintiff claims title were inferior to other, earlier patents covering the same land.
 
 I.
 
 6
 On appeal, plaintiff repeatedly argues that defendant did not prove the validity of its chain of title. However, in our previous decision in this matter, this Court held that "[i]f Noble is unable to demonstrate valid title to the property, any defects in National's chain of title are irrelevant." Id. at 146. In so holding, we cited Stewart Lumber Co. v. Fields, 445 S.W.2d 140, 142 (Ky.1969) (plaintiff asserting title has "burden of demonstrating the strength of his own title and may not prevail merely by pointing out weaknesses" in his adversary's title) and Coleman Mining Co. v. McClanahan, 237 S.W.2d 543, 544 (Ky.1951) (stating that "[i]t is well settled that in an action for trespass when the issue of title is raised, the burden is upon the plaintiff to prove his title"). See also Barren County Board of Education v. Jordan, 249 S.W.2d 814, 815 (Ky.1952) (in trespass case, plaintiff "must rely on the strength of its own title, and cannot recover on the weakness of the defendant's title").
 
 
 7
 Plaintiff asserts that this reading of Kentucky law is incorrect. Instead, he argues that the District Court should have reviewed all the evidence as to both plaintiff and defendant's competing claims. He premises this argument on the theory that defendant sought affirmative relief, either explicitly or implicitly, in that defendant wanted the validity of its title upheld. Plaintiff cites several old cases for the proposition that Kentucky law requires the trial court in such cases to consider the validity of both plaintiff and defendant's claim to title.
 
 
 8
 As a factual matter, the District Court found that defendant did not explicitly ask for affirmative relief, i.e., a declaration that its lease was valid as against all other claims to the property. Reviewing defendant's answers, it appears that defendant only once explicitly asked for a declaration that its leasehold interest was valid, and that was in its answer to an intervening complaint filed by Carol Ash. Because this complaint was withdrawn, and Ash is no longer party to this suit, the District Court did not err in its factual determination that defendant did not ask for affirmative relief as to this plaintiff.
 
 
 9
 Plaintiff cites several older Kentucky cases which provide that sometimes a defendant's answer is, in reality, a counterclaim asking the court to find that defendant possesses valid title to the property at issue. See, e.g., Strunks Lane & Jellico Mountain Coal & Coke Co. v. Anderson, 276 Ky. 576, 124 S.W.2d 779 (1939); Combs v. Combs, 238 Ky. 362, 38 S.W.2d 243 (1931). As a consequence, these Kentucky courts have ruled that trial courts must compare evidence as to plaintiff and defendant's respective claims to title, seemingly in conflict with the law of this case that plaintiff bears the burden of proving valid title to the property. For example, in Strunks Lane, the defendant asserted title to the disputed property and the court ruled that the defendant's answer was, in effect, a counterclaim. 124 S.W.2d at 780. As a result, the court said, all evidence must be considered and the trial court should have considered whose title was superior. Id. In Strunks Lane, the court remanded the case because the trial court had not inquired sufficiently into either plaintiff or defendant's claim to title. Id. at 781.
 
 
 10
 Another older case cited by plaintiff is Bennett v. Parsons, 226 Ky. 782, 11 S.W.2d 935 (1928). Defendant in Bennett was in possession of the property in question. The highest Kentucky court held that plaintiff could maintain a quiet title suit. Id. at 936. Importantly, the court ruled that, although defendant did not specifically ask for affirmative relief in its answer, his answer must be taken as a counterclaim because there was no way he could succeed without showing plaintiff's deed to be fraudulent. Id. In fact, the Bennett court seems to have put the burden on defendant to show that plaintiff "acquired her title by fraudulent means." Id. at 937. But see Cumberland Co. v. Kelly, 156 Ky. 397, 160 S.W. 1077, 1078 (1913) (defendant not deemed to have made a counterclaim, which would have necessitated inquiry into which party had superior title, where defendant was in possession and merely asserted title and possession in himself).
 
 
 11
 We feel that McGiboney v. Newman, 277 Ky. 835, 127 S.W.2d 860, 863 (Ky.1939), resolves this apparent conflict. This case by Kentucky's highest court instructs us to focus on the source of plaintiff and defendant's relevant claims to title. The court in McGiboney makes a distinction between whether defendant claims the property through a chain of title different from and hostile to plaintiff's or through the same source as plaintiff. According to McGiboney, if defendant and plaintiff claim title through the same source, then a court must look into the validity of each party's claim to title, even if defendant has not explicitly asked that his claim to title be declared superior. However, similar to the facts of the case at bar, if defendant claims the property through title received from some third party which is hostile to plaintiff's title, then McGiboney dictates that a court should not consider defendant's answer a counterclaim, instead focusing only on the validity of plaintiff's claim to title. Id. Accordingly, based on McGiboney and the more recent cases, Stewart Lumber Co., Coleman Mining Co., and Barren County Board of Education, we see no reason to alter our previous decision on this matter and accordingly put on plaintiff the burden of proving the validity of his claim to title.
 
 II.
 
 12
 We next analyze whether plaintiff met his burden of proving valid title to the disputed tracts of land. Under Kentucky law, there are three ways in which plaintiff can establish title to the disputed land: "(1) paper title deducible from the Commonwealth; (2) adverse possession for the statutory period; and (3) title to a common source." Noland v. Wise, 259 S.W.2d 46, 48 (Ky.1953) (citation omitted). Plaintiff does not claim valid title by adverse possession or from a common source. Instead, his claim relies on two patents issued by Kentucky: (a) the E.R. Totten Patent No. 65798, which was issued on June 26, 1896 and covers the lower 130 acres of the disputed land (referred to as the "lower Totten patent") and (b) the A.I. Totten Patent No. 65181, which was issued on July 13, 1892 and covers the upper 165 acres (referred to as the "upper Totten patent").
 
 
 13
 It is undisputed that under Kentucky law, from the time of the Totten grants to today, only vacant and unappropriated land can be validly patented. See Nolen v. Hall, 26 Ky.L.Rptr. 773, 82 S.W. 418, 418 (Ky.1904) (discussing statute in effect when all patent grants relevant to this case were made). The District Court found that the upper and lower Totten patents were invalid because other, earlier patents encompassed the land. Specifically, the District Court found that eight patents issued to M.J. Amyx covered all of the lower Totten patent and approximately sixty percent of the upper Totten patent. Issued in 1867, the Amyx patents are clearly senior to, and therefore superior to, the upper and lower Totten patents, issued in 1892 and 1896 respectively.
 
 
 14
 In February 17, 1872, an "overlap" patent was issued to Stephen Reid. This patent encompasses approximately 154,800 acres and had the effect of giving to Reid all land within the area not previously patented. It is undisputed that the boundaries of the Reid patent include within it all the land in the upper and lower Totten patents (in other words, all land in this dispute). The District Court found that the Reid patent had the effect of giving to Reid in 1872 all lands not covered by the earlier Amyx patents in the disputed area, primarily the 40 percent of the upper Totten patent. Since plaintiff does not claim title through the Reid patent, his claim to title through the Totten patents, which were issued after the "overlap" Reid patent, must be invalid. Furthermore, once the Reid patent is found to convey validly all land in the disputed area not patented to someone else before 1872, it is correct to ignore, as the District Court did, all plaintiff's arguments regarding the overlap of the Amyx and Totten patents. Because the disputed land fell well within the Reid patent's coverage of over 154,000 acres, it is immaterial exactly what the Amyx patents cover because the Reid "overlap" patent had the effect of giving Reid good title in 1872 to what was not covered in the Amyx patents. Because Reid possessed good title to all previously unpatented land in the area in 1872, the subsequently-issued Totten patents were invalid because the Commonwealth of Kentucky had already parted with the land it purported to give to the Tottens some twenty years later. Accordingly, the District Court did not err in deciding that plaintiff's claim to title through the Totten patents was invalid.
 
 III.
 
 15
 Plaintiff's alternative argument for reversal on the merits can be disposed of rather quickly. He claims that a series of four deeds (collectively referred to as the "Tevis" chain of title), dating from 1845 to approximately 1890, and putatively covering the disputed land, somehow operated to invalidate the Reid and Amyx patents, but not the Totten patents through which plaintiff claims title to the land. The District Court found that the Tevis chain of title "started nowhere and it ended nowhere" and we agree. Plaintiff never showed how Tevis initially got title to the disputed property--no adverse possession, grant from the Commonwealth or common source origin--and plaintiff never connected the Tevis chain of title, assuming it could be proved valid, with his own claim to title. Accordingly, this argument must also fail.
 
 IV.
 
 16
 Consolidated with this appeal on the merits is a separate appeal regarding the payment of the special master's fee in connection with this case. The District Court initially ordered each party to pay one-half the cost of the special master, approximately $4000 each. Several months passed without payment by plaintiff. When the District Court inquired as to why plaintiff had not paid his share of the fee, plaintiff stated that he was destitute. The District Court asked plaintiff five questions regarding his income and assets, which plaintiff answered by affidavit. The District Court then required defendant to pay as an initial matter plaintiff's share of the special master's fee. Because defendant had earlier been awarded its costs in this case, the District Court increased the amount of defendant's costs by the same amount.
 
 
 17
 We reserve judgment on this issue, pending settlement negotiations by the parties. If no mutual agreement is reached by the parties within a reasonable time, we will issue an order deciding this matter. Otherwise, as to the decision of the District Court on the merits of the land dispute, we AFFIRM.
 
 
 
 *
 The Honorable Thomas G. Hull, Chief Judge for the United States Court for the Eastern District of Tennessee, sitting by designation